***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments on appeal. The Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in the Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the deceased employee and the defendant-employer from March 2, 1984, through April 8, 1986, and from June 23, 1986, through April 28, 1989.
3. Aetna Casualty Surety was the compensation carrier on the risk.
4. The deceased employee died of aplastic anemia on September 8, 1993.
5. At the time of his death, the deceased employee was survived by two whole dependents, his wife, Susan Marshburn, and a daughter, Ashleigh Kaitlyn Marshburn, born March 31, 1992. The parties also stipulated to the following:
1. Plaintiff's medical records, marked Stipulated Exhibit
2. Videotape deposition and transcript of deposition of the decedent Mitchell Marshburn, marked Stipulated Exhibits 3 and 4.
3. The decedent's Social Security earnings records, marked Stipulated Exhibit 5.
4. Material Safety Data Sheets provided by the defendant-employer through discovery, marked Stipulated Exhibit 6.
5. Certified OSHA inspection records pertaining to the defendant-employer, marked Stipulated Exhibit 7.
6. The decedent's death certificate, marked Stipulated Exhibit 8.
7. Marriage certificate, marked Stipulated Exhibit 9.
8. Bill for funeral expenses, marked Stipulated Exhibit 10.
9. Birth certificate of Ashleigh Kaitlyn Marshburn, marked Stipulated Exhibit 11.
10. Documentation concerning the decedent's medical bills and outstanding balances, marked Stipulated Exhibit 12.
11. Industrial Commission Forms 18, 33, and 33R, marked Stipulated Exhibit 13.
12. Statement from Dr. Joseph Moore, marked Stipulated Exhibit 14.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Employee Mitchell Marshburn was 32 years old when he died of aplastic anemia on September 8, 1993. At the time of his death, Mr. Marshburn was survived by his wife, Susan Marshburn, and his fifteen-month-old daughter, Ashleigh Kaitlyn Marshburn.
2. The defendant-employer was engaged in the business of manufacturing mobile homes. The plant at which Mr. Marshburn worked was a large tin building, approximately 100 feet wide by 300 feet long. The production process took place in this building in assembly-line fashion, with the homes being moved from one station to the next as the work was completed. There were two large bay doors at the front and the back of the building, which were left open during the summer and closed during the winter. The building was not air-conditioned, and in the summer the temperature inside the building was in excess of 100 degrees. There were large fans in the ceiling, approximately 50 to 60 feet above the production floor. There were also smaller fans throughout the plant to blow the air around, but no exhaust fans or hoods to vent the fumes to the outside.
3. For almost five years beginning in 1984, Mr. Marshburn was employed by the defendant-employer in the lag-down department. As a lag down employee, Mr. Marshburn was responsible for running wires, installing HVAC duct work, cutting and rolling out the insulation, spraying on the undercoating, and bolting the chassis to the floor.
4. Mr. Marshburn's job with the defendant-employer was described as the dirtiest job in the plant. He used an industrial-type spray gun to apply the undercoating, which created a thick cloud of paint and fumes. He worked directly adjacent to the station where the tile adhesive was applied with an industrial-type spray gun, and that process created a fog of fumes in his area that took his breath away. The fans in the plant were turned off when Mr. Marshburn sprayed, to keep the fumes and paint from blowing on the other workers. Mr. Marshburn was occasionally offered paper masks, but they are ineffective against chemicals and fumes, and he could not wear them anyway because within minutes of putting one on, it would become so coated with black paint that he could not breathe through it. By the end of the workday, Mr. Marshburn was covered with black paint.
5. Mr. Marshburn usually worked five days of 12-hour shifts and additionally one half-day of work per week. Twice each day, before leaving for lunch and at the end of the workday, Mr. Marshburn would clean himself up using Varsol 18, a liquid substance which he kept at his workstation in a three to five gallon open bucket to clean the nozzle of his spray gun. The Varsol was particularly effective in removing the black undercoating, so twice a day, Mr. Marshburn would dip his hands in the bucket of Varsol and rub it over his hands, arms, neck and face, to remove the black paint that covered him.
6. Within a few weeks of beginning to work at Champion, Mr. Marshburn's hands became dry and cracked. He developed deep, open cracks and fissures in his hands that remained a problem throughout his employment with the defendant-employer. He also noticed that a black substance would come out when he sneezed or blew his nose, and he began coughing up black material and eventually blood. In addition to being very fatigued while employed by the defendant-employer, he also noticed that his heart was racing, a symptom associated with exposure to benzene. Mr. Marshburn left his employment with the defendant-employer in 1989 primarily because of health concerns, and shortly thereafter these complaints resolved.
7. In 1992, while employed by Brinks as a messenger, Mr. Marshburn began feeling very fatigued. He went to see Dr. Boone, who had been treating him for an unrelated spinal cord syrinx. Dr. Boone ran an MRI, the results of which suggested metastatic disease. He referred Mr. Marshburn over to Dr. Tremont, an oncologist at Rex, who, after further testing, confirmed a diagnosis of aplastic anemia and referred him to Duke Medical Center.
8. Aplastic anemia is a disease affecting the bone marrow, similar to leukemia. In aplastic anemia, the bone marrow fails and blood counts fall. It is a serious disease, oftentimes although not invariably fatal. In approximately fifty percent of the cases, the cause of aplastic anemia is unknown. However, there are known causes which are well-documented in the literature, that include viruses, such as hepatitis C, radiation, model airplane glue, the antibiotic chloramphenicol, and exposure to chemicals, including benzene.
9. At Duke Medical Center, Mr. Marshburn came under the care of Dr. de Castro and Dr. Moore, both specialists in the field of hematology/oncology. In going over his history with the doctors, Mr. Marshburn described the exposure to chemicals while employed at the defendant-employer. Dr. de Castro and Dr. Moore considered the chemical exposure significant, and believed that it had contributed to Mr. Marshburn's development of aplastic anemia.
10. In addition to traveling out to Duke Medical Center several times each week for blood transfusions, over the next 9 months Mr. Marshburn underwent ATG therapy and a bone marrow transplant. He developed multiple complications following the bone marrow transplant, and ultimately succumbed to the disease on September 8, 1993. The medical treatment Mr. Marshburn received at Duke Medical Center was not experimental and was reasonable and necessary to affect a cure, give relief, and lessen the period of disability.
11. As a result of his aplastic anemia, Mr. Marshburn was unable to earn the same wages he was earning when diagnosed, in the same or any other employment, from November 12, 1992, through the date of his death.
12. As a result of his aplastic anemia, Mr. Marshburn incurred out of pocket medical expenses totaling $4,573.00, and mileage expenses traveling to and from Duke Medical Center totaling $1,516.00. Brink's group health care plan (the intervener) paid $670,000.00 in medical expenses, and there are unpaid balances of $26,122.54 to Duke Medical Center and $29,921.65 to Duke's Private Diagnostic Clinic.
13. Mr. Marshburn's average weekly wage, based upon his gross earnings during his last full year of employment ($21,613.11) is $415.64.
14. Varsol 18 is a petroleum solvent manufactured by Exxon. Varsol 18 contains benzene, a well-recognized bone marrow toxin and potent human carcinogen. Exposure to even relatively small amounts of this solvent on a chronic repetitive basis can result in significant toxicity.
15. Mr. Marshburn had a significant exposure to benzene while employed by the defendant-employer. The most significant aspect of the exposure was the time period over which he was exposed and the manner in which he was exposed. He had a severe dermal exposure, consistently twice a day for almost five years, when he rubbed down a "considerable fraction of his total body surface" with Varsol to clean up. The cracks in his hands greatly increased the rate of dermal absorption. In addition, his exposure through inhalation of the Varsol that vaporized when he rubbed it on his body, as well as that which vaporized from the open bucket at his work station, and that which vaporized when the 10 to 12 employees sprayed Varsol 18 in the final cleanup on each home, added to his total body burden of the toxin. Mr. Marshburn's exposure to benzene while employed by the defendant-employer placed him at an increased risk of developing aplastic anemia as compared to members of the general public not so employed.
16. There is a dose-response relationship between exposure to benzene and the development of disease. Benzene is a cumulative poison, the increased exposure to which directly relates to an increased risk of disease. The chronicity and extent of Mr. Marshburn's dermal and inhalation exposure was so significant that both of his treating physicians and two credentialed toxicologists attributed his development of aplastic anemia to his exposure at work. Mr. Marshburn's exposure to benzene while employed by the defendant-employer was a significant contributing factor to his development of aplastic anemia and subsequent death.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Mr. Marshburn's aplastic anemia was an occupational disease compensable under the North Carolina Workers' Compensation Act. His employment with the defendant-employer placed him at an increased risk of developing the disease, as compared to members of the general public not so employed, and was a significant contributing factor to his development of the disease. G.S. § 97-53(13). Rutledge v. Tultex Corp./KingsYarn, 308 N.C. 85, 301 S.E.2d 359 (1983).
2. Mr. Marshburn was temporarily and totally disabled from November 12, 1992, through the date of his death. N.C.G.S. § 97-29. These benefits are payable to plaintiff as administratrix of employee's estate.
3. Mr. Marshburn's death on September 8, 1993, proximately resulted from his compensable occupational disease. Therefore, his widow and minor daughter, as the only whole dependents on the date of death, are entitled to weekly benefits as set out in G.S. § 97-38 and burial expenses of $2,000.00.
4. The defendants are liable for all medical expenses incurred by Mr. Marshburn for treatment of his compensable occupational disease and, therefore, shall reimburse the intervener for all expenses the group health plan paid. The defendants shall also reimburse plaintiff in the amount of $6,089.00, and pay the remaining unpaid medical bills totaling $56,044.19. Medical bills subject to reimbursement must be submitted to the Industrial Commission.
5. Mr. Marshburn's average weekly wage should be calculated based upon his earnings during the 52-week period immediately preceding the date of diagnosis. Moore v. Standard Mineral Co., 122 N.C. App. 375,469 S.E.2d 594 (1996). Because the only information available to determine the average weekly wage is the Social Security Earning Report, and since Mr. Marshburn did not work 52 weeks in 1992, his average weekly wage should be calculated using the earnings reflected for 1991, the last full calendar year he worked.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned makes the following:
 AWARD
1. The defendants shall pay plaintiff, as administratrix of the deceased employee's estate, temporary total disability benefits at the rate of $277.23 per week for the period from November 12, 1992, through September 8, 1993. This compensation has accrued and shall be paid to plaintiff in a lump sum, subject to the attorney's fee hereinafter approved.
2. The defendants shall pay plaintiff and the minor child death benefits in the amount of $277.23 per week. Plaintiff's benefits shall be paid at the rate of $138.61 per week for a period of 400 weeks from the date of death. Benefits payable to Ashleigh Kaitlyn Marshburn shall be paid at the rate of $138.62 per week from the date of death for 400 weeks or until Ashleigh Kaitlyn Marshburn turns age 18, whichever occurs last. That compensation which has accrued shall be paid in a lump sum, subject to the attorney's fee hereinafter approved. Benefits due the minor child Ashleigh Kaitlyn Marshburn must be paid to her mother and natural guardian Susan Marshburn Barnes, for the use and maintenance of Ashleigh Kaitlyn Marshburn.
3. The defendants shall reimburse the intervener for the medical expenses it paid on account of Mr. Marshburn's aplastic anemia after the bills for these expenses are submitted to the Industrial Commission.
4. The defendants shall reimburse plaintiff medical expenses in the amount of $4,573.00, mileage in the amount of $1,516.00, and funeral expenses in the amount of $2,000.00. The bills for the medical expenses shall be forwarded to the Industrial Commission.
5. The defendants shall pay the unpaid medical expenses to Duke Medical Center in the amount of $26,122.54 and Duke's Private Diagnostic Clinic in the amount of $29,921.65. The bills for these medical expenses shall be forwarded to the Industrial Commission.
6. The defendants shall pay the costs due the Commission.
7. An attorney fee of 25% of the compensation awarded herein is hereby approved for plaintiff's counsel. The defendants shall forward 25% of the accrued compensation directly to plaintiff's counsel and, thereafter, every fourth check for the balance of her fee.
8. The defendants shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER